IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LEANN CAMPBELL,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 5:21-cv-1780<br><br>DISTRICT JUDGE<br>JOHN R. ADAMS<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Leann Campbell filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

In August 2019, Campbell filed an application for Disability Insurance Benefits alleging a disability onset date of June 8, 2019, and claiming she was disabled due to spondylolisthesis, radiculopathy, and foraminal stenosis at L5-S1; degenerative discs at L4 through S1 and C5-C7; arthrofibrosis and "permanently stiff right knee replacement"; Hashimoto's disease;

hypothyroidism; insomnia; right acromioclavicular joint arthritis; carpal tunnel syndrome in the right hand and wrist; moderate plantar heel spur in the left foot; and mild scoliosis.[1] Tr. 424. The Social Security Administration denied Campbell's application and her motion for reconsideration. Tr. 334, 346. Campbell then requested a hearing before an Administrative Law Judge (ALJ). Tr. 401.

In October 2020, an ALJ held a hearing. Campbell and a vocational expert testified. Tr. 50-80. In November 2020, the ALJ issued a written decision finding that Campbell was not disabled. Tr. 16-43. The ALJ's decision became final on August 12, 2021, when the Social Security Appeals Council declined further review. Tr. 1-4; *see* 20 C.F.R. § 404.981.

Campbell filed this action on September 16, 2021. Doc. No. 1. She asserts the following assignment of error:

> Whether the Administrative Law Judge's residual functional capacity finding is supported by substantial evidence regarding the evaluation of medical opinions and findings in the record.

Doc. No. 11, p. 1.

**Evidence**

*1.     Personal and vocational evidence*

Campbell was born in 1966 and was 53 years old on the alleged disability

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2

onset date. Tr. 424. She completed 2 years of college and used to work for the postal service as a mail carrier and office clerk. Tr. 57, 73, 443.

### 2. *Medical evidence*[2]

Campbell has a history of right arm problems since 2003. In 2003, Campbell had right shoulder impingement syndrome and a right supraspinatus tendon tear. Tr. 605. She then had subacromial decompression surgery. Tr. 605, 664. Campbell also has right carpal tunnel syndrome. Tr. 606.

In June 2017, Campbell saw orthopedic specialist Reuben Gobezie, M.D., for pain in both shoulders, although her right was worse than her left. Tr. 664. Campbell's exam showed positive findings on O'Brien and Speed's tests.[3] Tr. 666. Dr. Gobezie diagnosed right shoulder osteoarthritis and right bicipital tendonitis. Tr. 666. Dr. Gobezie gave Campbell a cortisone injection in her right shoulder joint and her right bicep tendon. Tr. 666-667.

In April 2018, Campbell saw Sami Moufawad, M.D., at a pain management clinic for back and leg pain. Tr. 679. Dr. Moufawad detailed Campbell's low back electrodiagnostic study results and her back and leg

---

[2]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Campbell only challenges the ALJ's decision as to her shoulder, wrist and hand impairments. Doc. No. 11, pp. 14-18. So I only cite the medical evidence corresponding to those impairments.

[3]     The O'Brien test is used to assess the cause of shoulder pain, like a torn labrum or an abnormality in the acromioclavicular joint. See https://my.clevelandclinic.org/health/diagnostics/22609-o-brien-test (last visited 10/5/2022). A Speed's test is used to determine tendonitis.

3

symptoms. Tr. 679. Campbell said that her shoulder pain was controlled. Tr. 679. Campbell took pain medication sparingly and it helped control her symptoms. Tr. 679. Campbell's exam showed minimal impingement of her right shoulder and a positive Tinel's sign[4] over her right median wrist "with paresthesias to the mid palm." Tr. 681. Dr. Moufawad recommended home exercises for Campbell's shoulder and a neutral wrist splint. Tr. 682.

In June 2018, Campbell saw Louis DeMicco, D.O., for back pain in connection with her worker's compensation claim. Tr. 728. At that time, Campbell was working with restrictions. Tr. 728. Campbell also reported weakness and pain in her right shoulder, especially when lifting overhead. Tr. 728. Dr. DeMicco found that Campbell had right shoulder flexion and abduction to 130-140° before she reported pain. Tr. 728.

In July 2018, Campbell saw Dr. Moufawad in pain management for back and leg pain. Tr. 684. Campbell also reported shoulder pain and, in her right hand, "coldness" and "diminished feeling." Tr. 684. Campbell said her shoulder pain was constant, moderate to moderately severe, and her shoulder was so painful at times that she didn't want to move and it hurt to sleep on it. Tr. 684. For all her symptoms, Campbell took Lyrica, which helped her sleep. Tr. 684. Taking Lyrica during the day affected her ability to think clearly. Tr. 684.

---

[4]     Tinel's sign is a tingling feeling a person experiences when a healthcare provider taps the skin over a nerve. It may indicate nerve compression or nerve damage. *See* https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign#:~:text=What%20is%20Tinel%27s%20sign%3F,damage%20where%20they%27re%20tapping (last visited 10/5/2022).

Campbell took oxycodone, which helped relieve some of her pain. Tr. 684. She took oxycodone occasionally but she didn't take it at night because it gave her a mild headache or an upset stomach. Tr. 684. Campbell said that she felt tired and fatigued every day and she didn't feel like doing most things she used to enjoy. Tr. 684-685. More pain made those feelings worse. Tr. 685. Dr. Moufawad found that Campbell had minimal impingement of her right shoulder and positive Tinel's sign over her right wrist "with paresthesia to the mid palm." Tr. 686. Dr. Moufawad wrote that Campbell moved slowly that day due to increased pain and stiffness. Tr. 686.

In August 2018, Campbell saw orthopedist Dr. Gobezie for right shoulder pain. Tr. 668. An exam of Campbell's right shoulder showed no muscle atrophy or crepitus on movement. Tr. 669. Campbell had full strength of her shoulder muscles, normal external rotation, tenderness of her right bicep and acromioclavicular joint, and a positive O'Brien test. Tr. 669. Dr. Gobezie wrote, "Given the fact that [Campbell] does not have too much pain," we recommended she continue to treat this shoulder conservatively in the form of activity modification and observation." Tr. 669. Dr. Gobezie told Campbell to call the office if she wanted another cortisone injection. Tr. 669.

In early October 2018, Campbell saw Dr. Gobezie again for right shoulder pain. Tr. 671. Campbell said that her pain was getting worse. Tr. 671. Campbell's right shoulder exam showed no atrophy or crepitus during movement. Tr. 671. She had bicep tenderness, normal strength, reduced range

of motion, and positive O'Brien's and Speed's tests. Tr. 671. Dr. Gobezie submitted a request for another round of shoulder injections. Tr. 673.

The next day, Campbell saw Dr. Moufawad in the pain management clinic for back pain and right shoulder pain. Tr. 689. Campbell also said she had numbness and tingling in the fingers of her right hand, which affected her ability to use her hand "for manual dexterity" and to type. Tr. 689. Campbell's exam showed minimal impingement of her right shoulder and a positive Tinel's sign with paraesthesia "to the mid palm and base of the 2nd and 3rd fingers." Tr. 691. Dr. Moufawad gave Campbell work limitations for her job as a mail carrier based on her low back, shoulder, and wrist pain. Tr. 692. Dr. Moufawad wrote that she could carry and lift up to 10 pounds twice a day, drive for one hour, stand for one hour, and sit for 6 hours. Tr. 692.

At the end of October 2018, Campbell saw Dr. DeMicco in connection with her worker's compensation claim. Tr. 725. Campbell said that she had pain and stiffness in her right shoulder. Tr. 725. Campbell also reported back pain. Tr. 725. Upon exam of her right shoulder, Campbell had pain over her anterior shoulder joint and decreased strength and range of motion. Tr. 725. Dr. DeMicco noted that Dr. Gobezie was trying to get Campbell approved for right shoulder injections. Tr. 725. That day, Dr. DeMicco completed a Duty Status Report for Campbell's worker's compensation claim.[5] Tr. 622. Dr.

---

[5] The signature on the Duty Report is illegible but the date corresponds with Dr. DeMicco's exam.

DeMicco wrote that Campbell could lift up to 10 pounds for up to 2 hours a day, sit 6 hours a day with breaks, stand one hour a day with breaks, walk one hour a day with breaks, and rarely climb, bend, or stoop. Tr. 622. Campbell could not kneel. Tr. 662. She could twist up to an hour a day and push or pull 10 pounds for up to 2 hours a day. Tr. 622. Campbell was limited to "minimal" reaching above her shoulder. Tr. 622. Campbell could perform simple grasping 8 hours a day and fine manipulation, including keyboarding, for up to 2 hours a day. Tr. 622. Campbell would need breaks every 10 to 15 minutes while sitting. Tr. 622.

In December 2018, Campbell returned to Dr. DeMicco. Tr. 724. Campbell reported pain in her low back and right shoulder and numbness over her right thumb, index, and middle fingers from her carpal tunnel syndrome. Tr. 724. Campbell hadn't heard back from Dr. Gobezie about whether her right shoulder injections had been approved, but she said that her shoulder had improved and she didn't need the injections. Tr. 724. Dr. DeMicco found that Campbell had pain over her right anterior shoulder and proximal bicep tendon and "fairly good" range of motion in her right shoulder. Tr. 724. Campbell was still working with restrictions. Tr. 724.

In January 2019, Campbell saw Dr. Moufawad at the pain management clinic. Tr. 693. Campbell complained of radiating low back pain, right shoulder pain, and right hand numbness and tingling. Tr. 693. She reported difficulty reaching at shoulder level and with manual dexterity. Tr. 693. Dr. Moufawad's

exam findings were the same as Campbell's prior visits: minimal impingement of the right shoulder and positive Tinel's sign of the right wrist with paresthesia to Campbell's mid palm and the base of her second and third fingers. Tr. 695. Dr. Moufawad reissued the same work restrictions for Campbell as he did in October 2018. Tr. 696.

In March 2019, Campbell saw Dr. DeMicco in connection with her worker's compensation claim. Tr. 723. Campbell was working with restrictions and awaiting approval of right shoulder injections. Tr. 723. Campbell reported that her lower back and right shoulder bothered her and her right wrist was stiff. Tr. 723. She said that she avoided heavy lifting. Tr. 723. Dr. DeMicco's exam found some pain in Campbell's right shoulder and some tenderness to palpation over the volar aspect of her right wrist. Tr. 723. Campbell had weakness in her hand grasp and her shoulder flexion and abduction was 140-150°. Tr. 723. That day Dr. DeMicco issued another Duty Status Report and listed the same work restrictions for Campbell as he did in October 2018. Tr. 623.

In April 2019, Campbell saw Dr. Moufawad at the pain management clinic for pain in her lower back, neck, and right arm. Tr. 698. Campbell also reported tingling in her right hand. Tr. 698. Campbell's right arm and hand exams were the same as her prior visit. Tr. 700. Dr. Moufawad requested a diagnostic study of Campbell's right arm "because of the aggravation of the carpal tunnel syndrome." Tr. 701.

In June 2019, Campbell saw Dr. DeMicco. Tr. 722. Campbell told Dr. DeMicco that she was never approved for right shoulder injections and that her pain was getting worse. Tr. 722. Campbell had stopped working. Tr. 722. Campbell's exam findings showed right shoulder pain and decreased range of motion and strength. Tr. 722. Dr. DeMicco ordered a shoulder MRI. Tr. 722. The MRI showed interval acromioplasty, mild hypertrophy of the acromioclavicular joint, edema and thickening of the joint capsule, and pronounced tendinitis of the paraspinatus and infraspinatus tendons that had increased since the prior study. Tr. 654-656.

In July 2019, Campbell saw orthopedist Dr. Gobezie for right shoulder pain. Tr. 674. Campbell reported that her pain worsened "with motions away from her body" and that she also had neck pain, numbness, and tingling. Tr. 674. Dr. Gobezie's exam showed decreased range of motion in Campbell's cervical spine and a positive Spurling's test.[6] Tr. 674. Dr. Gobezie found that Campbell had pain with internal rotation of her right shoulder, acromioclavicular tenderness, normal shoulder strength, 140° of shoulder flexion, and a positive Speed's test. Tr. 675.

Two days later Campbell had an electrodiagnostic study of her right arm. Tr. 630-31. The findings showed "mild right focal median neuropathy at

---

[6]     A positive Spurling's test can indicate nerve problems in the cervical spine.

9

the wrist compatible with mild Carpal Tunnel Syndrome" and no evidence of axonal loss or membrane instability. Tr. 631.

In August 2019, Campbell saw Dr. DeMicco to discuss her test results. Tr. 721. Campbell advised that she was "going to hold off" on right shoulder injections because the pain was "bearable." Tr. 721. Campbell was not working. Tr. 721. Campbell's exam showed a weak right-hand grasp and pain over the volar aspect of her right wrist. Tr. 721. In Campbell's right shoulder, she had decreased range of motion and strength and pain over her acromioclavicular joint. Tr. 721.

In October 2019, Campbell saw Dr. Moufawad at the pain management clinic for a follow-up visit. Tr. 768. Campbell's exam findings were the same as her prior visit. Tr. 770. Dr. Moufawad prescribed Nucynta for pain because Campbell reported headaches from oxycodone. Tr. 768, 771. Dr. Moufawad continued Campbell's home exercise program for her right shoulder and recommended that she wear a neutral right wrist splint "mainly at night." Tr. 771.

In November 2019, Campbell saw Dr. DeMicco in connection with her worker's compensation claim. Tr. 745. Campbell reported pain in her right shoulder and low back and weakness in both hands. Tr. 745. Campbell stated that she had trouble bending, twisting, lifting, and carrying heavy objects. Tr. 745. Campbell's exam showed a weak hand grasp in both hands; her right was worse than her left. Tr. 745. Campbell had right shoulder weakness. Tr. 745.

Campbell's right shoulder flexion was 150° and her abduction was 100-110°. Tr. 745.

In December 2019, Campbell saw Mollie Manley, M.D., at the Summit Hand Clinic for a left-hand evaluation. Tr. 831. Campbell complained of occasional stabbing and pinching pain in her left wrist and thumb and occasional numbness and tingling. Tr. 831. She reported difficulties with activities of daily living. Tr. 831. An exam of Campbell's left hand and wrist showed a mildly positive Finkelstein's[7] test and generalized pain. Tr. 833, 834. An x-ray of Campbell's left hand was normal. Tr. 826. Dr. Manley assessed Campbell with De Quervain's tenosynovitis and gave Campbell a corticosteroid injection. Tr. 834. Campbell saw an occupational therapist, who fit her for a thumb splint. Tr. 830. Campbell told the therapist that her left-hand symptoms had worsened over the last 6 months from repetitive work and typing. Tr. 827. Campbell explained that it was hard to hold objects after too much typing and that washing dishes caused pain. Tr. 827.

Campbell's primary care physician referred her to James Wackerly, P.T., D.P.T for a functional capacity assessment in connection with her Social Security disability application. Tr. 780. Campbell saw Wackerly in January 2020. Tr. 780. Campbell stated that she stopped working in June 2019. Tr. 780.

---

[7]     A Finkelstein test is used to diagnose De Quervain tenosynovitis. De Quervain is a painful condition affecting the tendons on the thumb side of the wrist. *See* https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/symptoms-causes/syc-20371332 (last visited 10/5/2022).

Campbell cited her insomnia and her pain and dysfunction in her right shoulder, lower back, and right knee as reasons why she found it difficult to perform "all work-related duties and be productive." Tr. 780. Wackerly performed various tests and commented that Campbell performed with "a high consistency of effort" during testing. Tr. 789. Campbell performed 4 cycles of "lifts"—lifting a tote with progressive weights from different heights—and, afterwards, rated her right shoulder pain as 4 out of 10, 10 being the worst. Tr. 786. Wackerly commented that Campbell scored well on manipulation and dexterity testing. Tr. 789. Campbell "complain[ed] of minimal symptoms" and she completed tasks "at levels rated from low to extra high." Tr. 789. Wackerly assessed Campbell's tolerance for gripping and keyboarding stamina to be "occasional," or up to 2.5 hours in a workday. Tr. 789. Campbell's tolerance for reaching with her left arm was "occasional" and reaching with her right arm was "seldom," or less than 0.2 hours in a workday. Tr. 789.

Later that month, Campbell had a follow-up with Dr. Manley at the hand clinic. Tr. 822. Campbell complained that she didn't feel like her left hand was getting better. Tr. 822. She was wearing her splint on and off throughout the day, depending on her activity, and she wore it all night. Tr. 822. Campbell said that her splint was too tight and that pain woke her up at night. Tr. 822. Campbell didn't want surgery because surgery "makes her worse." Tr. 822. Dr. Manley sent Campbell to the occupational therapist, who adjusted her splint,

12

and Dr. Manley advised that Campbell should continue with "splinting and conservative care." Tr. 822, 824, 838.

In May 2020, Campbell had a telehealth visit with Dr. Moufawad at the pain management clinic for her back and shoulder pain. Tr. 948. Dr. Moufawad remarked that Campbell was doing her home exercises again and that she was doing water therapy, which helped with her radicular neck pain. Tr. 948. Campbell took Nucynta as needed and Lyrica helped with her burning pain. Tr. 938.

### 3.  State agency opinions[8]

In October 2019, Leanne Bertani, M.D., reviewed Campbell's record and assessed her physical residual functional capacity (RFC).[9] Dr. Bertani opined that Campbell could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. Tr. 341. Campbell could

---

[8]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

occasionally push and pull with her right leg, climb ramps and stairs, and crawl. Tr. 341-342. She could frequently balance, stoop, kneel, and crouch. Tr. 341-342. Dr. Bertani also found that Campbell could never climb ladders, ropes, or scaffolds. Tr. 342. Campbell could occasionally reach overhead with her right arm, frequently handle and finger with her right hand, and she should avoid concentrated exposure to unprotected heights. Tr. 342.

In April 2020, Steve McKee, M.D., adopted Dr. Bertani's findings except that he limited Campbell to frequent handling and fingering with both hands. Tr. 353-355. Later that month, medical consultant Alicia Blando, M.D., adopted Dr. McKee's findings. Tr. 848-849.

### 4. *Hearing testimony*

Campbell, who was represented by counsel, testified at the administrative hearing held in October 2020. Campbell stated that she worked for the United States Postal Service from 2001 to 2019. Tr. 57-60. She started as a letter carrier but was placed on modified duties since 2003 because of her medical conditions. Tr. 57, 65. Before Campbell left the postal service, she held a customer service position that involved "intermittent computer work, not too much typing or using the hands." Tr. 57. The heaviest weight she lifted was 10 pounds because that was her work restriction. Tr. 58.

When asked why she was unable to work, Campbell stated that she has musculoskeletal problems, pain, poor energy, fatigue, recurrent abdominal pain, and difficulty concentrating. Tr. 61. When Campbell sits, she frequently

must stand up to walk around. Tr. 61. Campbell "can't type a lot" because it aggravates her wrist pain. Tr. 61. She has shooting, stabbing pain in her left wrist and carpal tunnel in her right wrist, "which isn't as bad, [but] can also get aggravated." Tr. 61. When asked to rate her pain 1 through 10, for all her symptoms, Campbell answered, "Probably on average about a 5. I'm always in some moderate pain." Tr. 62. Campbell referenced severe abdominal pain that she rated 8 or 9 out of 10. Tr. 62.

Campbell stopped taking Lyrica because it interfered with her "mental function," although it helped with her pain and sleeplessness. Tr. 62. Campbell has two prescribed opioid medications but they cause headaches and constipation. Tr. 62-63. Campbell could walk for 10 to 20 minutes and lift 10 pounds safely and 20 pounds with difficulty, but she "rarely do[es] that." Tr. 63. Campbell described a typical day: she wakes up, prepares and eats breakfast, washes dishes, goes through the mail, and pays bills or makes telephone calls. Tr. 64. She runs her errands—to the grocery store or library—during the afternoon when she has energy. Tr. 64. Campbell might also do some housecleaning or get something done around the house, like paperwork. Tr. 64. She takes rest breaks and sits with her shoulder massage pad. Tr. 64. She might read or drive to a local park to take a short walk. Tr. 65. Campbell makes dinner, watches the news, reads, and takes a bath using a "handicap chair." Tr. 65. When asked what her day is like when she is experiencing above-average pain, Campbell stated that she would lie down when she has

15

abdominal pain or back pain. Tr. 69. Pain makes it harder for her to concentrate. Tr. 71.

When asked to describe her musculoskeletal problems, Campbell stated that she has a left heel spur, knee arthritis, left hip tendonitis, and mid- and low- back pain. Tr. 66. She has right shoulder arthritis and can't do "repetitive duties." Tr. 66. It's painful and can be reaggravated easily. Tr. 66. Campbell has De Quervain's tenosynovitis in her left wrist and has shooting and stabbing pains. Tr. 66. She said that she "can be doing something pretty minimal like the dishes and get shooting and stabbing pains." Tr. 67. Campbell has carpal tunnel in her right wrist, which can be aggravated if she does too much. Tr. 67. She has hypothyroidism, which causes poor energy levels and fatigue, and she has insomnia, which affects her ability to function during the day. Tr. 67. Campbell typically gets 9 to 10 hours of sleep per night. Tr. 67.

When asked if her pain level ever rose above a 5 out of 10, Campbell said that her hip sometimes gets up to 6 or 7 or worse, as well as her knee, back, and shoulder. Tr. 68. Campbell's shoulder gets so painful that she can't lift it above shoulder level. Tr. 68. That doesn't happen all the time, but her shoulder pain can get up to 6 or 7 out of 10 "or a type of pretty severe pain where just moving it at all is very painful." Tr. 68.

When asked what problems her De Quervain's tenosynovitis caused in her left wrist, Campbell said she has stabbing and shooting pain "kind of on the interior." Tr. 69. When asked about her right carpal tunnel syndrome,

16

Campbell said that typing too much aggravates "around the carpal tunnel area and just start[s] hurting more." Tr. 69. It's usually not too bad if she doesn't irritate it, but "any time the repetitive use type stuff can easily aggravate it." Tr. 69. Campbell said that she can pick up change from a table and button a shirt. Tr. 70. Opening jars used to be easy for her but it can be difficult now. Tr. 70. Campbell buys cat litter in a 30-pound container and has a store employee put it in the back of her car. Tr. 71. Once she's home, Campbell uses a cup to remove about 10 pounds of litter at a time, which she puts in another container and brings into the house. Tr. 71.

The ALJ discussed with the vocational expert Campbell's past relevant work as a customer service clerk and administrative clerk at the post office. Tr. 73-74. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Campbell could perform her past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.[10] Tr. 75-76. The vocational expert answered that such an individual could perform Campbell's past work as a customer service clerk and an administrative clerk. Tr. 76.

---

[10]    A vocational expert's testimony "is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she 'can and cannot do,' there exist a significant number of employment opportunities for her in the regional and national economies." *Webb*, 368 F.3d at 633. The vocational expert considers the claimant's RFC, "'age, education, and work experience' and assesses whether the claimant 'can make an adjustment to other work.'" *Id*. (quoting 20 C.F.R. § 416.920(a)(4)(v)).

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since June 8, 2019, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.     The claimant has the following severe impairments: degenerative disc disease (DDD) of the lumbar spine with spondylolisthesis and radiculopathy, and DDD of the cervical spine and thoracic spine; status post (s/p) total right knee arthroplasty; tendinitis and osteoarthritis of the right shoulder; carpal tunnel syndrome (CTS) of the right upper extremity, and De Quervain's tenosynovitis of the left upper extremity; and plantar fasciitis and heel spur of the left foot (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), except that she can only occasionally push and pull with the right lower extremity, and is further limited in the following nonexertional abilities:
    - Can never climb ladders, ropes, or scaffolds but can occasionally climb   ramps and stairs; can occasionally crawl; and can frequently balance, stoop, crouch, and kneel;
    - Can frequently reach overhead with the right upper extremity;
    - Can frequently handle and frequently finger bilaterally; and
    - Can never work at unprotected heights or around moving mechanical parts.

6.     The claimant is capable of performing past relevant work as a Customer Service Clerk and as an Administrative (Office) Clerk. Neither of these occupations requires the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from June 8, 2019 through the date of this decision (20 CFR 404.1520(f)).

Tr. 18–43.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.    Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.    Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.    Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.    What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

19

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or

decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

1.    *The ALJ's evaluation of the state agency reviewing physicians' opinions as to Campbell's ability to reach overhead with her right arm is not supported by substantial evidence.*

Campbell challenges the ALJ's RFC assessment limiting Campbell to "frequent"[11] overhead reaching with her right arm. Doc. No. 11, p. 14. Campbell asserts that there is record evidence showing that she is more limited than that. Doc. No. 11, pp. 14-16. She argues that the state agency reviewing physicians found that she could perform "occasional"[12] overhead

---

[11]    "Frequent" is defined as an "[a]ctivity or condition [that] exists from 1/3 to 2/3 of the time." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, U.S. Dept. of Labor, 1993, at ID-2.

[12]    "Occasional" is defines as an "[a]ctivity or condition [that] exists up to 1/3 of the time." Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, U.S. Dept. of Labor, 1993., at ID-2.

reaching with her right arm, and that the ALJ's rejection of that limitation is not supported by substantial evidence. Doc. No. 11, p. 14. The Defendant maintains that the ALJ properly evaluated Campbell's RFC and the opinion evidence. Doc. No. 13, pp. 10-11.

The ALJ detailed the state agency reviewers' opinions—Dr. Bertani in October 2019 and Drs. McKee and Blando in April 2020. Tr. 38-39. As to those doctors' opinions that Campbell could only *occasionally* reach overhead with her right shoulder, the ALJ wrote:

> … the State agency [reviewers'] specific finding as to only occasional overhead reaching ability with the right arm is excessive of support from the cited rationale in full 5/5 strength, and the fairly good range of motion observed by Dr. DeMicco and specific measurement of flexion at 150-160 degrees by Dr. Gobezie are not consistent with only occasional overhead reaching (see Ex. 2A/6). Despite what she might have had in June 2017 via the cortisone injection, Dr. Bertani's statement that the claimant has treatment for the right shoulder arthritis and bicipital tendinitis is not consistent with the subsequent medical evidence, which shows no further injections received for intermittently increasing, but ultimately self-reducing shoulder pain. Thus, the overhead shoulder limitation to only occasional is less persuasive.

Tr. 39-40.[13] But the state agency reviewers' "cited rationale" for the *occasional* overhead reaching limitation was "due to tear of anterior supraspinatus/infraspinatus insertion," not the reasons the ALJ cite above. Tr. 342. So the ALJ's description of the state agency reviewers' reasoning for that restriction is inaccurate.

---

[13] Dr. Gobezie found that Campbell had 150° of flexion in her right shoulder, not 160° degrees. Tr. 666.

While true that Campbell had 5 out of 5 strength in her right shoulder at visits with Dr. Gobezie, Campbell had reduced strength in her right shoulder at three appointments with Dr. DeMicco. Tr. 725 (October 2018); Tr. 722 (June 2019); Tr. 721 (August 2019). The ALJ did not acknowledge those findings of reduced strength.

Also, it is true that Campbell did not have right shoulder steroid injections after June 2017. The record, in part, supports the ALJ's finding that this was because Campbell reported decreased symptoms at times and chose to not have injections. *See*, *e.g.*, Tr. 721. But the record also shows that, at times, Campbell didn't have injections because she was waiting for approval, and, once, because she had not been approved for injections. *See*, *e.g.*, Tr. 723 (March 2019 treatment note showing that Campbell reported that her right shoulder was "bothering her" and that she was "still waiting for approval" for right shoulder injections); Tr. 722 (June 2019 treatment note showing that Campbell reported that she wasn't approved for injections). The ALJ did not acknowledge those reasons why Campbell didn't receive shoulder injections.

And while Campbell advised that she was "going to hold off" on right shoulder injections because the pain was "bearable" in August 2019, as the ALJ noted, Campbell had also stopped working by then. Tr. 31, 721. So the ALJ's finding that Campbell's right shoulder pain was "intermittently increasing, but ultimately self-reducing" is not entirely accurate—Campbell's pain may have "ultimately" been reduced because she stopped working. Tr. 40. This is

23

important because the ALJ found that Campbell could perform her past work—work Campbell was performing while complaining of shoulder pain. Tr. 40, 723.

For all the reasons explained above, the ALJ's evaluation of the state agency reviewers' opinion that Campbell could *occasionally* reach overhead with her right arm is not supported by substantial evidence.

2. *The ALJ's evaluation of Campbell's right-hand impairment is supported by substantial evidence.*

Campbell argues that the ALJ discounted her right-hand symptoms. Doc. No. 11, p. 17. Campbell asserts that the ALJ's statement—that "no treatment has been pursued for right-sided CTS beyond continuing to wear the wrist splint"—is wrong because Campbell did not refuse treatment for her carpal tunnel syndrome. Doc. No. 11, p. 17. Campbell's argument misses the mark. The ALJ did not say that Campbell refused treatment. The ALJ explained that Campbell's July 2019 testing showed "mild" findings consistent with mild carpal tunnel syndrome. Tr. 31-32. The ALJ observed that Campbell pursued treatment with Dr. Manley at the hand clinic for her left hand, but not her right hand, which underscored the mild nature of Campbell's right hand carpal tunnel syndrome. Tr. 32. The ALJ noted that physical therapist James Wackerly wrote that Campbell had "no treatment for the right [carpal tunnel syndrome]" in his January 2020 evaluation. Tr. 38, 782. So the ALJ's statement that Campbell did not pursue treatment for her right carpal tunnel syndrome "beyond continuing to wear the wrist splint" is accurate.

24

Campbell complains that the ALJ "excluded" Dr. DeMicco's opinion limiting Campbell's fine manipulative abilities, like typing, to up to 2 hours a day. Doc. No. 11, p. 17. While true that the ALJ did not cite Dr. DeMicco's assessed manipulative restriction, the ALJ explained that he rejected Dr. DeMicco's opinion as a whole because Dr. DeMicco didn't "provide any direct rationale or supportive medical findings for [his assessed] limitations." Tr. 37. That reasoning holds true for Dr. DeMicco's manipulative limitations. *See* Tr. 970 (Dr. DeMicco's Duty Status Report showing no rationale or medical findings for any of his restrictions, including for Campbell's manipulative abilities).

Campbell cites exam findings from visits with Dr. DeMicco showing that she had weak hand grasp, Doc. No. 11, p. 17, but Dr. DeMicco opined that Campbell had no limits on her ability to grasp, as the ALJ observed. Tr. 37. Campbell asserts that the ALJ "ignored" Dr. Moufawad's exam findings, Doc. No. 11, p. 17, but the ALJ considered Campbell's reports of right-hand symptoms and Dr. Moufawad's exam findings. Tr. 28. Campbell cites the state agency reviewers' opinion that her reports of symptoms were consistent with the evidence, but those physicians, like the ALJ, found that Campbell could *frequently* handle and finger. See, e.g., Tr. 342. So the state agency reviewing physicians' opinion supports the ALJ's decision that Campbell can *frequently* handle and finger.

25

Finally, Campbell cites Wackerly's finding that Campbell had "low" grip strength to support her argument that she could only *occasionally* grip with her right hand. Doc. No. 11, p. 18. But the ALJ discounted Wackerly's conclusions. Tr. 38. The ALJ explained that during Wackerly's evaluation,

> [Campbell's] [g]rip strength registered between 45 and 50 pounds, and Ms. Campbell presented with zero pain in the right wrist/carpal tunnel and with only mild (2/10) left thumb pain, notably after the cortisone injection administered six weeks earlier by Dr. Manley for the newly diagnosed De Quervain's tenosynovitis (Ex. 18F/3). Mr. Waverly also observed that the claimant had "scored well" during manipulative testing and manual dexterity testing, resulting in "minimal" symptoms and confirming no treatment for the right CTS, which are not supportive of the occasional gripping ability and occasional "keyboarding stamina" in both hands.

Tr. 38. Campbell does not challenge that portion of the ALJ's decision, and it is supported by substantial evidence.

Campbell has not shown that the ALJ erred with respect to her right hand impairment.

**Conclusion**

For the reasons explained above as to Campbell's right shoulder impairment, I recommend that the Commissioner's decision be reversed and remanded for proceedings consistent with this opinion.

Dated: October 5, 2022

         */s/ James E. Grimes Jr.*
         James E. Grimes Jr.
         U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).